No. 23,431.

N. B. GEBHART and J. W. KRAFT, *Appellees,* v. THE KANSAS STATE BANK et al., *Appellants.*

SYLLABUS BY THE COURT.

MONEY—*Delivered to Bank for Investment—Written Agreement—Bank Liable for Repayment of Money.* Assuming that money was delivered to a bank for investment and not as a deposit, it is held that the evidence justified a finding that the bank did not exercise ordinary diligence in investing it, and is liable for its repayment.

Appeal from Saline district court; DALLAS GROVER, judge. Opinion filed April 8, 1922. Affirmed.

*John L. Hunt,* of Topeka, and *B. I. Litowich,* of Salina, for the appellants.
*Z. C. Millikin,* of Salina, for the appellees.

The opinion of the court was delivered by

MASON, J.: On October 28, 1915, N. B. Gebhart and J. W. Kraft, as executors, had $6,750 in their hands for investment. They turned it over to the Traders State Bank, of Salina, its president giving them a receipt undertaking to show the nature of the transaction. That bank was later reorganized as the Kansas State Bank. On September 26, 1918, the executors brought his action against the

bank for the recovery of the amount named. A receiver for the bank was appointed May 27, 1919, and was made a defendant. A verdict was returned and a judgment rendered in favor of the plaintiffs, and the defendants appeal.

The defendants assert that the money was given to the bank for investment for the benefit of the executors; that it was invested in promissory notes; and that the evidence did not justify a judgment against them on any theory. The plaintiffs contend that the transaction amounted to a deposit, which they had a right to withdraw on thirty days' notice; and that even if the bank held the money for investment on their account its conduct made it liable to them for its return. . The body of the receipt referred to read as follows:

"This is to acknowledge that you have this date left with us a sum of $6,750.00 which is to draw six per cent interest from date. Interest payable semi-annually. It is to be divided into two sums as follows: Elsie Basel, $2,750.00, Rose Rittersbacher, $4,000.00. We have agreed to keep this invested for you, as executors, in good negotiable loans that will net your estate six per cent interest. It is understood also that this fund is to remain a considerable time in this form, but if for any reason it should be necessary to have any or all of it withdrawn all parties agree that with thirty days' notice it will at all times be available."

The first and last sentences suggest a deposit, while the next to the last sentence standing alone would indicate an undertaking to keep the money so invested as to return six per cent interest. There was evidence tending to show these facts:

The bank paid the executors interest every six months at the rate stipulated until April, 1918. It used the money for its own purposes and selected from among the notes owned by it, bearing seven per cent interest, several amounting in the aggregate to something over $6,750, which it placed in an envelope indorsed with memoranda regarding the matter and kept in a different pouch from that containing the bank's notes. Whenever one of these notes so segregated was paid the bank would pass the money received in payment to its own credit and substitute a new note taken from those it already owned. Such exchanges may have taken place when no payment had been made. The executors were not consulted about these substitutions or advised of them, nor had they ever expressed a willingness that the bank should invest the money in notes of which it was the owner. The view of the bank's president was that the notes in the envelope belonged to the executors to the extent of $6,750, any surplus belonging to the bank, which was also entitled to the in-

terest in excess of six per cent. When the action was brought there were two notes in the envelope, given in the fall ·of 1917, for the total amount of $6,500, which proved uncollectible. They had been taken by the bank on the recommendation of Felix Broeker, who owned twenty per cent of the bank's stock, and on the strength of his indorsement. The bank in 1917 acquired paper indorsed by Broeker totaling some $220,000. A third note for $750 was placed in the envelope with the two referred to about a year after this action was begun.

Whatever general term may be applied to the transaction evidenced by the receipt its concluding sentence seems to show an agreement on the part of the bank to repay the money on thirty days' notice. If the relation of the plaintiffs to the bank is regarded as that of principal and agent for the purpose of investing the money, express authority, which was not conclusively established, would seem to be required to authorize the investment to be made by transferring to the principal notes owned by the agent. (2 C. J. 704.) The defendants concede that they are liable unless the bank exercised ordinary care and diligence in investing the money for the plaintiffs' benefit. We think the evidence warranted a finding, which must be presumed to have been made, that the bank did not meet that requirement. The circumstances gave room for the jury to draw an inference that some representative of the bank availed himself of the opportunity to unload its own worthless or doubtful paper upon the plaintiffs. The jury found specifically that the bank did not keep the money invested in good negotiable loans, that the president did not from time to time invest it in negotiable loans, but that it was finally invested in three loans. A special finding was also made which the defendants regard as showing good faith on the part of the bank. It was that its president believed Broeker was solvent when he took the two notes in the envelope bearing his indorsement. This falls short; however, of determining that the notes were regarded as good at the time they were placed in the envelope for the plaintiffs.

The judgment is affirmed.